[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
Statement of the Case
This is an action instituted by the plaintiff, Printed Circuits Unlimited, Inc., against the defendant, Sensor Switch, Inc., seeking damages for defendant's failure to pay for goods delivered under a sales agreement. The defendant has denied liability and has filed special defenses and counter-claims. The special defenses claim among other things that plaintiff failed to manufacture the goods according to specifications; shipped more goods than ordered; charged more than was agreed upon; and failed to mitigate its losses. Defendant's counterclaim is in three counts. The first count seeks damages based on plaintiff's alleged breach of the contract; the second count seeks damages for conversion based on plaintiff's alleged refusal to return CT Page 8774 defendant's artwork given to plaintiff in order for plaintiff to manufacture the goods under the contract; and the third count alleges that plaintiff violated the Connecticut Unfair Trade Practices Act, C.G.S. § 42a-110. The bench trial of the case was held on September 10 and 11, 1996.
Finding of Facts
The substance of the case involves the defendant's purchase of circuit boards from plaintiff. Plaintiff manufactures circuit boards on which computer circuitry is placed. The defendant manufactures motion censors and other computer products. Defendant uses circuit boards as part of its manufacturing process. In March 1991, plaintiff's salesman, Robert Schindhelm, contacted the defendant's president, Brian Platner, to determine whether plaintiff could supply circuit boards to defendant. When initially manufactured, these circuit boards are attached to each other and are surrounded by a panel. Each panel can hold from 15 to 30 boards depending on the size of the panel and the size of the circuit boards. After the computer circuitry is placed into the boards by a manufacturer such as defendant, each board is detached from the panel and individually set or manufactured into the final product. After the boards are detached from the panels, the panels themselves are discarded.
When the parties met, Dominic Colavita, plaintiff's president, was given a tour of defendant's facilities and was informed about defendant's manufacturing needs. Mr. Colavita was shown various panels consisting of circuit boards. These panels were made with a plastic, nonmetal type material, and while the panels varied in size, none of them were more than approximately five and one-half inches in width by twelve inches in length. The defendant asked Mr. Colavita whether he could produce circuit boards of similar nature and design and he said he could. Defendant provided artwork to plaintiff to be used for production of the circuit boards. Subsequently, defendant submitted to plaintiff three purchase orders for three different types of circuit boards.
The first purchase order was dated March 19, 1991 and requested delivery of 12,000 circuit boards, part number 017. The purchase order listed the unit price as $1.07. The purchase order directed delivery in five shipments over a two month period: 1000 units by April 1 1000 units by April 8 2000 units by April 18; and the balance of the units to be delivered on two dates CT Page 8775 thereafter. In response on March 26, 1996, plaintiff shipped a sample which consisted of one panel with seven circuit boards. Plaintiff's shipping invoice listed the unit price as $1.25 rather than the $1.07 unit price indicated on defendant's purchase order. At trial, plaintiff failed to explain satisfactorily this discrepancy. Defendant's president, Brian Platner, testified that defendant never agreed to the price increase, but paid the invoice because of inadequate coordination between defendant's purchase office and accounts payable office.
On April 8, 1991 plaintiff shipped 1,048 units of the 017 circuit boards. Again plaintiff's invoice indicated a per unit price of $1.25. Soon after delivery defendant found that the sides of the panels were made from metal, which made defendant's use of the circuit boards very difficult. Defendant's manufacturing process involves the use of a soldering machine to solder computer circuits onto the circuit boards. The metal on the sides of the panels adversely affected this process. Nevertheless, in May 1991, defendant paid for the April 8, 1991 delivery of 1,048 017 circuit boards and accepted an additional delivery of 3,095 017 circuit boards which plaintiff shipped on April 23, 1991. Defendant did not pay plaintiff's $3,900.20 invoice for the April 23, 1991 shipment (the invoice also included a $31.45 shipping charge).
On April 6, 1991, defendant sent the second and third purchase orders to the plaintiff. The second purchase order requested delivery of 2000 circuit boards, part number 016, by May 1, 1991. The cost per unit was 70 cents for a total cost of $1400. Brian Platner and Dominick Colavito had a telephone conversation about this order before plaintiff delivered the goods. Mr. Platner asked Mr. Colavito to manufacture the circuit boards so that as many boards as possible were placed on a panel. Mr. Platner testified that he wanted plaintiff to arrange as many boards as possible on the standard 5 and 1/2 inch by 12 inch panel. Mr. Colavito, on the other hand, understood Mr. Platner differently. He believed that Mr. Platner wanted the size of the panels to be enlarged so that more circuit boards could fit on each panel. Plaintiff increased the size of the panel to 18 inches by 12 inches — a size entirely too large for defendant's manufacturing purposes. On April 12, 1991, plaintiff shipped 2,204 units of the 016 circuit boards. The invoice for this shipment was $1750.10 (which included a $195.00 nonrecurring tooling charge and a $12.30 shipping charge). Defendant used 679 of the 016 circuit boards by cutting the panels in half, but CT Page 8776 found that this procedure was too time consuming and cumbersome. Instead, defendant made a design change which eliminated the need for the 016 circuit boards entirely.
The third purchase order, sent on April 6, 1991, requested delivery of 12,000 circuit boards, part number 018, at a cost of 75 cents per unit. On April 18, 1996, defendant's production manager, Keith Platner, went to plaintiff's plant to pick up the first shipment of the 018 circuit boards and found that they were on panels that were slightly too long. Additionally, there was metal edging on the sides of the panels and the panels' shapes were irregular and uneven. Keith Platner advised defendant about these problems and called the defendant's president, Brian Platner. Keith and Brian decided to accept the order even though they knew the use of the panels would create manufacturing problems and delays. Keith Platner testified that the 018 circuit boards were needed to complete a large part of their then existing manufacturing orders, that clients were waiting for the final products, and that the defendant did not have time to reorder the 018 circuit boards from another manufacturer. Keith Platner accepted 3,788 units of the 018 circuit boards and plaintiff invoiced the defendant for $2,657.20 (at a rate of 65 cents per unit and including a $195 tooling charge). Defendant did not pay this invoice.
Before sending the second shipment of the 018 circuit boards, defendant contacted the plaintiff. Because the panels for the entire order were already produced, plaintiff would not start over; but plaintiff agreed to a process that cut the edges of the existing panels to a slightly decreased size. Defendant also made a technical design change in the 018 circuit board and issued a letter for plaintiff to ship 8000 units of this redesigned circuit board which was called 018A. Defendant requested delivery of 2000 units by May 20, 1991 and the remainder to be delivered as "scheduled" later. On May 17, 1991 plaintiff shipped 2,144 units of the 018A circuit boards and invoiced the defendant $1,674.36 (at a rate of 69 cents per unit and including a $195 tooling charge).
On May 30, 1991, plaintiff received two letters from defendant. The first letter, from defendant's vice president of operations, stated that the 017 and 018A circuit boards were fine, that no further changes were foreseen, and that the balance of the orders should be shipped on an "as needed basis." Later that day, plaintiff also received a letter from defendant's CT Page 8777 president, Brian Platner, cancelling all orders and requesting the return of all defendant's artwork "based on past history and all of the problems we're having." Brian Platner testified that he cancelled the orders after a discussion with defendant's salesman, Robert Schindhelm on May 30, 1991 wherein Mr. Schindhelm indicated that the plaintiff would be unable to ship the remaining 017 and 018A circuit boards until June 24, 1996. Mr. Schindhelm advised Brian Platner that plaintiff would usually need at least a four week turnaround time in order to satisfy orders. Brian Platner testified that this delivery problem, coupled with the problems with the panels, prompted him to cancel the remaining orders.
In summary, defendant failed to pay the invoices for the following orders:
April 12, 1991 016 $2,657.20
April 18, 1991 018 3,900.20
April 23, 1991 017 1,750.10
May 22, 1991 018A 1,674.36
In addition, defendant did not pay plaintiff's July 19, 1991 invoice for a cancellation charge of $2,093.46 for a total of $12,075.32.
DISCUSSION
 Plaintiff's Complaint
The court finds that although defendant explained in general terms the requirements and specifications regarding the desired circuit boards, it did not explicitly and clearly explain to plaintiff the specific qualifications needed for the panels holding these boards. The size of the panels was not a problem for plaintiff as evidenced by the fact that the plaintiff produced at least three different size panels for defendant in this case. The lack of initial clarity regarding the panel size is also evidenced by the later order of the 016 circuit boards when Brian Platner asked defendant to put as many circuit boards on each frame as possible without clearly explaining or emphasizing that he wanted to maximize the number of circuit boards which could be placed on a 5 1/2 inch by 12 inch panel. In CT Page 8778 short, plaintiff could have produced the panels according to whatever size the defendant specified. The fact that the panels provided by plaintiff caused defendant additional manufacturing costs is a problem which must be borne by defendant because the problem emanated from defendant's own failure to explain adequately or fully the required specifications.
Defendant's contentions to the contrary are rejected. Defendant claims that Dominic Colavito toured defendant's plant and saw the soldering machine. However, there was no evidence indicating that Mr. Colavito was shown the precise delivery frame of the soldering machine that was shown at trial; nor does the evidence establish that Mr. Colavito was actually told that the panels had to be a particular size in order to be used in this delivery frame.
Defendant also insists that before any orders were placed, Mr. Colavito received sample panels and circuit boards, and was asked if he could produce similar items. Again, the evidence fails to establish that defendant expressly indicated to Mr. Colavito that the panels had to be manufactured precisely to the size and specifications of the sample panels. Discussions between the parties were directed more toward the specifications of the circuit boards, rather than the specifications for the panels that surrounded them.
Defendant also claims that it should have been charged 65 cents per unit for the 018A circuit boards, rather than 69 cents per unit. Defendant's purchase order reflects a unit price of 70 cents. The actual charge of 69 cents per unit appears to be based on the negotiations causing the specification changes from the 018 unit to the 018A unit and, in any event, is less than the 70 cents per unit defendant agreed to pay, as reflected in its purchase order (Plaintiff's Exhibit G). Thus, the 69 cent charge appears appropriate.
In the following respects, the Court finds in favor of defendant on its special defenses. The purchase order, reflecting the quoted price of $1.07 per unit for the 017 circuit board, is the correct price. Plaintiff did not satisfactorily explain why the invoices indicated a price of $1.25 per unit instead of $1.07 per unit as indicated on the purchase order. This price difference reflects an overcharge totalling $745.74 (18 cent credit per unit for 4,143 units) for which the defendant shall receive credit. In addition, four of the plaintiff's invoices CT Page 8779 reflect $195.00 tooling charges. Although plaintiff indicates that these charges are part of its standard billing practices, there was no evidence that defendant agreed to pay them. As a result, defendant is entitled to an additional credit of $780.00. The defendant is also entitled to an $82.39 credit for seventy seven 017 circuit boards that defendant never received due to an undershipment by plaintiff. In total, defendant shall receive credits totalling $1,608.13. In all other respects the court finds in favor of the plaintiff on the complaint and on defendant's special defenses.
In summary, defendant shall pay the plaintiff $10,467.19 which represents deliveries totaling $12,075.32 less credits of $1,608.13 as noted above.
Defendant's Counterclaims
The first count of defendant's counterclaim seeks damages for plaintiff's breach of contract. The issues raised by this first count are essentially the same as those raised by defendant's special defenses. These issues were addressed above and resolved in the plaintiff's favor, except for the credits previously discussed.
The second count of the counterclaim seeks damages for plaintiff's alleged refusal to return defendant's artwork given to plaintiff in order to manufacture the goods pursuant to the contract. This issue was the subject of substantial, conflicting testimony and is resolved against defendant who has the burden of proof. The plaintiff's president, Dominic Colavita, testified that he did not retain any original artwork and only retained copies, and the plaintiff produced mailing receipts indicating that the artwork was returned to defendant. (See Plaintiff's Exhibits O, P, and Q).
The third count of the defendant's counterclaim alleges a violation of CUTPA. Defendant alleges that a verbal threat made by Dominic Colavita during a telephone conversation with Brian Platner constitutes an unfair trade practice. Mr. Colavita threatened to physically assault Brian Platner if plaintiff's invoices were not paid. This threat cannot be characterized as a mere verbal exclamation made during a heated discussion because the evidence further indicates that he referred to the threat during a subsequent telephone conversation. However, CUTPA only provides a cause of action to a person who "suffers any CT Page 8780 ascertainable loss of money or property, real or personal. . . ." C.G.S. § 42-110g.
Without definitively reaching the question concerning the extent to which CUTPA encompasses common law torts; see generallySportsmen's Boating Corporation v. Hensley, 192 Conn. 747,755-57, 474 A.2d 780 (1984); the court concludes that the evidence presented here, which demonstrates that the plaintiff suffered only emotional distress, is insufficient to meet the statutory requirement that the plaintiff suffer an ascertainable loss of money or property in order to maintain a CUTPA action.
CONCLUSION
For all the foregoing reasons, judgment enters in favor of plaintiff and plaintiff is awarded $10,465.93.
STEVENS, JUDGE